IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                    Case No.  24-10116-JWB

ENRIQUE ALONSO ESTRADA BARRIOS,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's Fourth Amendment motion to suppress evidence from two seizures and one search. (Doc. 19.)  The motion is fully briefed and ripe for decision.  (Docs. 19, 22, 23.)  The motion is DENIED for the reasons stated herein.

**I.     Facts**

Defendant's Fourth Amendment suppression claims arise from two traffic stops and one search that occurred on July 4, 2024.  Technical Trooper Cody Parr ("Parr") of the Kansas Highway Patrol conducted both stops and the search.  The first stop extended beyond the scope and mission of the traffic stop and ended with a brief search. The second stop occurred shortly thereafter.  It culminated in a more thorough search and discovery of about 216 pounds of methamphetamine.  The court held a suppression hearing on April 30, 2025, during which only Parr testified.  A full summary of the facts is as follows.

On July 4, 2024, Parr was on patrol on Kansas State Highway U-54.  Defendant was driving a white Chevrolet pickup in the east bound left lane on U-54.  At the location where Parr was parked and observing traffic, U-54 has four lanes: two lanes heading southwest and two lanes heading northeast.  Parr was parked off the road in a dugout on the south side of the highway (i.e.,

the side nearest the two lanes heading northeast). He saw Defendant traveling towards him—headed in the northeasterly direction on U-54. When Defendant was a short distance away from where Parr was parked, Parr observed Defendant driving continuously in the east bound left lane. In Kansas, when driving on a highway located outside of the corporate limits of a city that is divided into two lanes proceeding in the same direction, a vehicle must drive in the right lane unless it is (1) "[o]vertaking and passing a vehicle, (2) "preparing to make a proper left hand turn," (3) directed to transition to the left lane by "official traffic-control devices," or (4) "required by other provisions of law." K.S.A. § 8-1522(c). The video evidence partially corroborates that Defendant unlawfully remained in the left-hand lane while he approached and passed Parr.[1] (*See* Ex. 4 at 0:07–11.) Parr activated his emergency lights and stopped Defendant because of this observed traffic infraction.

After Parr pulled Defendant over, he approached the truck on the passenger side. (*Id.* at 2:58–3:05.) He encountered Defendant and Defendant's passenger, his twin brother, Jose Estrada Barrios. (*Id.* at 3:05–11.) Parr then requested that Defendant join him in his patrol vehicle. (*Id.* at 3:42–4:12.)

Upon entering the vehicle, Defendant volunteered that he and his brother had been stopped and the truck searched the day before. (*See* Ex. 3 at 4:17–18.) Parr asked where they were stopped, and Defendant told him that it was in Oklahoma. (*Id.* at 4:20–30.) Immediately thereafter, Defendant told Parr, without any prompting, that they spent the previous night at a hotel. (*Id.* at 4:31–33.) When Parr inquired about which town Defendant and his brother stopped for the night, Defendant told him that the hotel was in Liberal, Kansas. (*Id.* at 4:35–41.) After a brief exchange

---

[1] It only partially corroborates Parr's testimony because the squad car video recording does not capture Defendant driving toward Parr's location. However, it does indicate that when Defendant drove past Parr, he was in the left lane. Moreover, Parr testified that he observed Defendant driving in the left lane before Defendant passed his location.

about Liberal and its hotels, Parr asked Defendant if he owned the truck.  (*Id.* at 4:40–55.)  Defendant informed him that his youngest brother was the owner.  (*Id*. at 4:57–59.)  They spoke briefly about Defendant's family; his hometown of Belen, New Mexico; the crime in Albuquerque; New Mexico in general; and whether Defendant lived on Story Avenue. (*See id.* at 5:00–6:07.)

After this brief exchange about Defendant's life and New Mexico, Defendant again volunteered information.  He informed Parr that he works for Netflix. (*Id.* at 6:08–16.)  Parr then asked what Defendant does for Netflix, to which Defendant responded that he was a carpenter and remodels Netflix offices.  (*Id.* at 6:16–25.)  Parr inquired into when Defendant started carpentry work.  (*Id.* at 6:27–30.)  Defendant answered that he started working in carpentry at age eighteen.  (*Id.* at 6:30–32.)  However, Defendant again volunteered that he started traveling for work at a young age.  (*Id.* at 6:30–42.)

Parr followed the conversation about Defendant's work with standard traffic stop questions about Defendant's passenger's name and his occupation, the name of the youngest brother, whether the youngest brother allowed Defendant to borrow the truck, and where the youngest was currently located.  (*Id.* at 6:46–7:13.)  Defendant did not answer Parr's question about his youngest brother's whereabouts, volunteering instead that he recently sold the truck to the youngest brother.[2]  (*Id.* at 7:14–7:24.)  Defendant then randomly explained in a nonsensical manner that Jose wrecked his Dodge Challenger yet was still able to lend it to their youngest brother.  (*Id.* at 7:29–38.)

Parr then inquired into Defendant's and Jose's reason for traveling and their destination.  (*Id.* at 7:39–50.)  Defendant responded that they were traveling to Wichita to visit a friend and party with him.  (*Id.* at 7:41–50.)  However, he gave a nonsensical response when Parr asked if they had ever been to Wichita:

---

[2] Defendant did not inform Parr when he sold the truck.  However, he does say that his brother recently put new plates on the truck—about a month prior to the traffic stop at issue.  (*Id.* at 7:17–21.)

> **Trooper Parr:** You ever been there before?
> **Defendant:** No.  No.  That's where, that's where we're we're.  We like, pretty much saw these uh, the rules.  These rules over there.  Yeah, yeah, yeah.  I come over there in New Mexico.  Well, there's actually three lanes.  So the middle one and the end one.  Well, there's we're always here.
> **Defendant:** Yeah, have you [Trooper Parr] been there?
> **Trooper Parr:** Oh yeah
> **Defendant:** Yeah?
> **Trooper Parr:** Yeah
> **Defendant:** What's cool stuff to do? Not, not really?

(*Id.* at 7:51–8:23.)  After this brief exchange, both men laughed and Parr asked follow-up questions about Defendant's reason for visiting Wichita.  Parr asked if Defendant or Jose have friends or family in Wichita.  (*Id.* at 8:25–28.)  Defendant again responded that they were visiting a friend, but he added that they met him while working in construction.  (*Id.* at 8:30–33.)  Defendant then told Parr about the different cities he has lived and worked in for his job.  (*Id.* at 8:45–9:11.)  Parr then asked again which company employs Defendant and how he gets to travel to different cities.  (*Id.* at 9:08–10.)  Defendant explained that he works for different companies because he follows the money—he did not mention Netflix by name this time.  (*Id.* at 9:12–34.)  At this point, Parr exited the patrol vehicle to retrieve the insurance information from the truck.

When he approached the truck the second time, he did so on the driver's side.  (*See* Ex. 4 at 9:39–45.)  Parr testified that he approached the truck on the driver's side because the wind was blowing in a direction that would have allowed him to smell if Defendant or Jose had been using drugs or drinking alcohol before Parr pulled them over.  When Parr asked Jose for the truck's insurance, he also inquired about why they were visiting Wichita.  (*Id.* at 9:51–54.)  Jose gave the same answer as Defendant: they were visiting a friend from work.  (*Id.* at 9:56–10:29.)  However, Jose told Parr that they met him while working for the union—a detail that Defendant had omitted from his narrative. (*See id.* at 10:27–31.)  Parr reviewed the truck's insurance papers.  He asked if the insurance holder was the youngest brother.  (*Id.* at 10:44–46.)  Jose confirmed that the youngest

brother was the insurance holder for the truck, (*id.* at 10:46–52), so Parr returned the insurance paperwork to Jose and walked back to the patrol vehicle.

When Parr reentered his patrol vehicle, he printed a warning sheet, prepared it to give to Defendant, and asked when Defendant and Jose needed to be back at work. (Ex. 3 at 11:14–16.) At this point, the duration of the traffic-related portion of the stop ended. However, at the suppression hearing, Parr informed the court that Defendant was not free to leave because based on his observations during the stop, he suspected Defendant and Jose were smuggling drugs from New Mexico to Wichita. Parr asked Defendant if they were being paid to smuggle drugs into Wichita. (*Id.* at 11:33–38.) Defendant said no and reminded Parr that the truck had already been searched. (*Id.* at 11:37–47.) Defendant reiterated that it was an extensive search and that it occurred in Oklahoma. (*Id.* at 11:42–46.) Parr then inquired into the identity of the officer that conducted the search, asking Defendant if he was tall and had a beard. (*Id.* at 11:48–51.) Defendant told him that that the officer who conducted the search was neither tall nor had a beard. (*Id.* at 11:51–52.) Parr also asked if Defendant had driven the truck to the United States-Mexico border. (*Id.* at 12:11–13.) Defendant told him that he had taken the truck to the border, specifically to El Paso, Texas, and Juárez, Mexico.[3] (*Id.* at 12:15–19.) Defendant and Parr then talked briefly about El Paso. (*Id.* at 12:20–43.) After this conversation, Parr asked if he could look at the truck's seat bolts. (*Id.* at 12:44–45.) Defendant did not object and expressly permitted Parr to do so. (*Id.* at 12:45–46.) Parr testified that he did not see anything out of the ordinary, so he released Defendant and Jose.

---

[3] It is difficult to hear in the recording if Defendant said he drove the truck across the border to Juárez, Mexico. However, the court concludes after listening to the recording multiple times that Defendant said that he drove the truck to both El Paso and Juárez.

However, at the hearing, Parr informed the court that he never ceased suspecting Defendant and Jose were involved in some criminal activity related to smuggling or the illicit drug trade. Regardless, Parr left the scene first. He traveled northeast toward Wichita (i.e., the same direction Defendant was traveling) and attempted to catch a semi-truck with a blown tire that had driven past while he was conducting the first stop.

As Parr was driving, he ran the truck's current license plate number through a license plate reader ("LPR") database. He discovered that during the previous 13 days (i.e., June 22, 2024 through July 3, 2024), the truck had crossed the US-Mexico border 12 times. Parr then ran the previous owner's (i.e., the Defendant's) license plate number through the LPR. He discovered that the license plate number registered to Defendant had crossed the US-Mexico border 79 times between January 24, 2024 and June 21, 2024. In total, Parr discovered that in a span of less than five and half months, the truck had crossed the US-Mexico border 91 times. He also uncovered that after the truck reentered the United States, it would travel back and forth from El Paso to Dallas.

While trying to overtake the semi-truck, Parr also inquired into which law enforcement agency stopped and searched the truck the day before. Contrary to Defendant's statements that they were stopped in Oklahoma, Parr discovered that Texas law enforcement stopped Defendant and Jose. This discovery mattered because up until that point, Parr assumed an Oklahoma highway patrolman, whom he knows personally and respects as a highly competent narcotics investigator, searched the truck. To confirm his findings, Parr contacted Oklahoma Highway Patrol. He was informed that his colleague had been off duty the previous day. Parr then concluded that officers with insufficient expertise and experience conducted the prior search.

Thus, after uncovering that the truck had crossed the US-Mexico border 91 times, that it traveled in Texas during the period Defendant claimed to have been working in New Mexico, and that his Oklahoma colleague had not been involved in the prior search of the truck, Parr decided to stop Defendant a second time.  Parr turned around and started driving westward.  He quickly located the truck and stopped Defendant and Jose a second time.  (Ex. 6 at 2:00–24.)

When Parr arrived at the truck's window for the second stop, he did not feign that he was stopping Defendant for a traffic infraction.  He immediately accused Defendant and Jose of transporting drugs across state lines into Kansas.  He told them that he had received information that the truck does have a compartment.[4]  (*Id.* at 2:33–36.)  He informed them that they would either go to prison when he finds the drugs or that they could work with him to conduct a controlled delivery and apprehend the recipients in Wichita. (*Id.* at 2:52–3:05.)  He stated that he was willing to work with Defendant and Jose because they were polite.  (*Id.* at 3:20–26.)  Parr also informed them of the penalties for transporting drugs across state lines, and he asked again if they would like to work with him. (*Id.* at 3:28–55.)  Parr testified that Defendant then nodded his head up and down, indicating that he would like to work with Parr.  After Defendant nodded his head, he and Parr discussed the delivery process; for example, how Defendant planned to contact the intended recipient in Wichita, if the intended recipient knew Defendant had been pulled over and searched the day before, if they were being tracked with GPS, etc.

During the second stop, Parr conducted a thorough search of the truck.  He also called in a canine unit to assist with the search.  Parr testified that the canine was never used, but that the Kansas State Highway Patrolman with the canine unit, Trooper Austin Ackerman, helped Parr discover that the truck's bed liner could be completely removed.  (*Id.* at 26:07–27:50; 27:55–

---

[4] At the suppression hearing, Parr testified that this statement was untrue and that he had not been informed there was a drug compartment in the truck.

29:38.)  After the truck bed's liner was completely removed, he and Ackerman found 98 small cardboard boxes containing 216 pounds of methamphetamine.

## II.    Analysis

Defendant alleges that the two traffic stops and the search conducted during the second stop were unlawful.  As to the first stop, Defendant argues that it was not justified, and/or Parr's conduct during the stop extended beyond the scope of the mission of the traffic infraction. Regarding the second stop, Defendant argues that Parr unlawfully extended it by immediately asking about illicit drug activity.   He then asserts that Parr conducted an unlawful search during the second stop because it was not supported by probable cause. The court addresses Defendant's arguments by walking through the events giving rise to Defendant's Fourth Amendment challenge in chronological order.  Accordingly, the court includes subsections in its analysis that maintain the narrative's integrity and provides important context to the court's conclusions.

### A.    Standing

First, Defendant, "[a]s the party seeking suppression" must establish that his "Fourth Amendment rights were violated."  *United States v. Davis*, 750 F.3d 1186, 1189 (10th Cir. 2014). "[T]his principle is often called standing, the idea that personal Fourth Amendment rights must be at stake . . . ."  *Id.* at 1190 (quotation and citation omitted).  Fourth Amendment standing is not to be confused with Article III jurisdictional standing; instead, it is a useful shorthand for the "substantive doctrine that a defendant may not seek to exclude evidence based upon the Government's violation of someone else's rights."  *United States v. Guzman*, 710 F. Supp. 3d 996, 1002 (D.N.M. 2024).

The government does not argue against Defendant's Fourth Amendment standing.  Indeed, the only mention of Fourth Amendment standing is by Defendant in his motion's subsection that

addresses Parr's search during the second stop.  Because the government does not take issue with Defendant's Fourth Amendment standing, the court assumes Defendant has sufficient standing to assert his Fourth Amendment claims and addresses the events giving rise to those claims in turn.

### B.    Traffic Stop One

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  Thus, for a traffic stop to be lawful under the Fourth Amendment, it must be reasonable.  *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024). And a traffic stop is reasonable when it is "justified at its inception and . . . the officer's actions during the stop [are] reasonably related in scope to the mission of the stop itself." *Id.* (citation and quotation omitted).

A stop is justified at its inception if "an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).  To assess whether an officer's actions extended beyond the scope and mission of the traffic stop, the Tenth Circuit recently formulated a three-part test: "an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *United States v. Baker*, 108 F.4th 1241, 1248 (10th Cir. 2024) (quoting *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022).  Accordingly, even if an officer extended the traffic stop, if the officer

had reasonable suspicion to do so, the government may still prevail. *See Baker*, 108 F.4th at 1248. Furthermore, it is the government's burden to establish reasonable suspicion when a traffic stop extends beyond its traffic-based mission and prolongs it. *See United States v. Ludwig*, 641 F.3d 1243, 1248 (10th Cir. 2011).

### 1. Was the First Traffic Stop Justified?

Defendant argues that the first stop was unjustified because the government does not attempt to establish that Trooper Parr had probable cause to pull Defendant over for violating K.S.A. § 8-1522(c). (Doc. 19 at 5–6; Doc. 23 at 7–8.) Defendant asserts that the correct legal standard to determine if a traffic stop is justified is whether an officer had probable cause to believe a traffic violation occurred or is occurring. (Doc. 23 at 7–8.) However, he admits that the Tenth Circuit has rejected that the probable cause standard applies to traffic violations, and that at present, only requires the lesser standard of reasonable suspicion. (*See id.*) (citing *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001)).

In response, the government argues that Parr conducted the traffic stop because he witnessed Defendant violating a traffic law. (Doc. 22 at 10–11.) According to Parr's testimony at the suppression hearing, he observed Defendant commit a traffic violation. Where Trooper Parr was parked and observing traffic, Kansas state highway U-54 has four lanes: two lanes heading southwest and two lanes heading northeast. Trooper Parr was parked off the road on the south side of the highway (i.e., the side nearest the two lanes heading northeast). He observed Defendant traveling towards him—headed northeast on U-54. As the truck approached and drove past Parr, he witnessed Defendant driving continuously in the east bound left lane in violation of K.S.A. § 8-1522(c). Thus, the court concludes that the initial stop was justified because Parr witnessed Defendant violate a traffic law.

### 2.  Did Parr Unconstitutionally Prolong the First Traffic Stop?

Defendant alternatively argues that even if the stop was justified, Parr unconstitutionally prolonged it.  (Doc. 19 at 6–7.)  After Parr pulled Defendant over, he approached the truck on the passenger side.  He encountered Defendant and his twin brother, Jose.  Parr then asked Defendant to join him in the patrol vehicle.[5]  (Ex. 4 at 3:42–4:12.)  Defendant does not take issue with questions Trooper Parr asked during the traffic stop.  Instead, he argues that Parr unlawfully prolonged the stop by initiating a drug interdiction investigation.  (Doc. 19 at 7–8.)  Defendant argues that when Parr asked whether anyone was paying him and Jose to smuggle drugs into Wichita, Parr extended this first traffic stop beyond the scope of its traffic-based mission. (*See id.* at 8.)

The government does not disagree that the traffic stop was extended when Parr asked Defendant if he and Jose were trafficking illegal drugs.[6]  (*See* Doc. 22 at 11.)  However, it claims that this extension was justified because Parr had reasonable suspicion to believe Defendant was smuggling drugs.

Too reiterate, an officer may extend a traffic stop if he has reasonable suspicion to do so. *See Baker*, 108 F.4th at 1248.  Reasonable suspicion is defined "as a 'particularized and objective basis for suspecting' criminal conduct under a totality of the circumstances."  *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (citation omitted).  It is not an "onerous standard,"

---

[5] Defendant does not object to Trooper Parr's instruction that they converse in the patrol vehicle.  A police officer may direct a driver to exit a vehicle for safety concerns. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *see Maryland v. Wilson*, 519 U.S. 408, 412 (1997).  Moreover, the Tenth Circuit has determined that an order for an individual to exit their vehicle and sit in the patrol vehicle can be reasonable. *United States v. Vargas*, 57 F. App'x 394, 398 (10th Cir. 2003).  The reasonableness is determined by looking at the totality of the circumstances. *See id.* Because Defendant did not object to Parr's request, the court concludes that Parr's request was reasonable.

[6] Alternatively, the government argues that the stop had become consensual once Parr printed the warning sheet and prepared it to be given to Defendant.  Because the court concludes that Parr had reasonable suspicion to further detain Defendant, it need not address this alternative argument.  Moreover, Trooper Parr testified at the hearing that Defendant was not free to leave at this point.  Thus, given the contradictory evidence from Trooper Parr himself, the court is circumspect that the conversation about drug smuggling was consensual.

and "requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause." *Id.* (citation omitted).  However, the officer needs a "particularized and objective basis" for his suspicion to launch an investigatory detention.  *See id.*  A court assesses whether an officer had reasonable suspicion to detain an individual by looking at the totality of the facts. *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010).

First, Defendant was driving a pickup truck registered to his youngest brother who was in New Mexico.  The Tenth Circuit recognizes that the registered owner's absence may indicate illegal activity—specifically the transportation of illegal drugs.  *See United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (citing *United States v. Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008).  Standing alone, the absence of the registered owner may be insufficient to lawfully transition a traffic stop into an investigatory stop.   Nevertheless, it is a factor "relevant to the reasonable suspicion analysis."  *Id.*

Second, Defendant informed Trooper Parr that he had sold the truck to his youngest brother the month before.  Under Tenth Circuit precedent, the recent sale and registration of a vehicle is relevant and supports a finding of reasonable suspicion. *See United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015).  Moreover, Parr testified that drug trafficking organizations rotate owners of vehicles and their respective license plates to evade detection by LPRs.  He explained that by rotating owners and their license plates, it makes it appear as if the vehicle is not consistently making unexplained trips because the LPR does not record the same license plate number again and again. Although the court in *Moore* cautioned that recent registration should have minimal probative value, it nonetheless concluded that it is "one factor among many suggesting criminal activity."  *Id.*

12

Third, Defendant was overly friendly and offered information on his own. The Tenth Circuit has acknowledged that overly friendly conduct can indicate that a person is involved in criminal activity. *See United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (finding "nervous, talkative, and overly-friendly behavior" amounted to suspicious conduct). Here, Defendant bantered with Parr while sitting in the patrol vehicle, volunteering information about his employment history and his alleged current job at Netflix—a large and respected company. Trooper Parr asked Defendant what he did for work, to which Defendant responded that he was a carpenter within the construction industry. However, instead of silently waiting for Parr to ask a follow-up question, Defendant shared that he had been traveling for work since a young age. He also informed Parr, without prompting, that he was the previous owner of the truck and recently sold it to his youngest brother. Moreover, when Defendant first entered Parr's patrol vehicle, Defendant informed Parr that Oklahoma law enforcement officials had (a) stopped him and Jose, and (b) conducted a thorough search of the truck the previous day. Based on his conversation with Parr, it appeared to Parr that Defendant wished to convey that he was employed, was a well-respected member of the community, and had nothing to hide.

Fourth, some of Defendant's responses to Parr's questions were nonsensical and inconsistent. *See United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) (discussing how vague and inconsistent answers is suspicious because it indicates a person is fabricating a story on the spot). When Parr inquired about whether Defendant had ever visited Wichita, Defendant gave an incomprehensible and contradictory response:

> **Defendant:** No. No. That's where, that's where we're we're. We like, pretty much saw these uh, the rules. These rules over there. Yeah, yeah, yeah. I come over there in New Mexico. Well, there's actually three lanes. So the middle one and the end one. Well, there's we're always here.
> **Defendant:** Yeah, have you [Trooper Parr] been there?
> **Trooper Parr:** Oh yeah

**Defendant:** Yeah?
**Trooper Parr:** Yeah
**Defendant:** What's cool stuff to do? Not, not really?

(Ex. 3 at 7:51–8:23.)    Defendant also nonsensically rambled about Jose's wrecked Dodge Challenger: "Yeah. Yeah.  He was, uh, my, my, my other brother Jose, his, uh, he wrecked, his, uh, Challenger.  So he lend it to him." (*Id.* at 7:29–38.) It also appears that Defendant contradicted himself by saying Jose both wrecked and lent his Challenger to someone.  The statement is difficult to decipher, though.  Defendant and Jose also gave conflicting responses related to their employment.  Defendant initially stated that he worked for Netflix. A few moments later, he told Parr that he works for multiple companies, indicating that he follows the money and works for the entities that pay him the most.  Moreover, when Parr asked Jose about the friend they were visiting in Wichita, Jose told Parr that they met the friend while working for the union—a detail that Defendant never raised with Parr when discussing his employment.

The court notes that factors three and four may not, standing alone, justify Parr's reasonable suspicion that Defendant was engaged in criminal activity.  After all, most individuals get nervous when they are pulled over for a traffic violation.  They may respond poorly to questions and try to assuage any concerns by informing the officer that they are upstanding members of their communities.  Nonetheless, the court acknowledges that Defendant exaggerated his employment history and the prior search of the vehicle. It also recognizes that Defendant's nonsensical statements indicate he could have been fabricating the entirety or parts of his story while speaking with Parr.  Thus, the court finds that factors three and four are both relevant and support a finding that Parr detained Defendant because he reasonably suspected that he was engaged in illegal activity.

Lastly, Parr testified that the week before he stopped Defendant, he pulled over and conducted a search of an identical white GMC pickup truck that contained a specialized, post-manufacture compartment underneath the seat to hold drugs.  Parr explained to the court that Defendant's truck caught his eye as it traveled towards and passed him because he had recently stopped a nearly identical truck involved in smuggling.  Patterns and modes of criminal operations are objective observations that support a trained officer's reasonable suspicion that criminal conduct is afoot.  *See United States v. Cortez*, 449 U.S. 411, 418 (1981).  Parr's previous experience with a near identical vehicle that contained a secret compartment for smuggling drugs made him suspect that Defendant's truck had a similar compartment.  It did not.  Nonetheless, Parr's experience with a nearly identical truck supports his suspicion of criminal activity.  To a nontrained eye, a white truck might seem inconspicuous.  But according to Parr's testimony, he has over two decades of law enforcement experience, extensive training in drug interdiction, and has seized over 4000 pounds of illegal drugs throughout his career.  Drawing on his extensive experience, he suspected that drug cartels were outfitting ordinary-looking work pickup trucks with hidden compartments to smuggle drugs into and around the United States.  Although Parr's recognition of a plausible pattern is a relatively weak factor standing alone, it does support Parr's reasonable suspicion that Defendant was smuggling drugs when considered in concert with the other factors.

Parr clearly grew suspicious of Defendant throughout the traffic stop.  After all, he testified that Defendant was not free to leave after he printed and prepared the warning sheet.  The issue, however, is whether Parr's suspicion was based on a hunch.  Defendant urges the court to assess "this case . . . on its own context," and that the government must direct the court to objective bases that justify Parr's reasonable suspicion.  (Doc. 23 at 6–7.)  As already discussed, Parr had reason

to believe Defendant was smuggling drugs into Wichita not on the basis of an inarticulable hunch, but because of the following observations: (1) the owner of the truck was not present, (2) Defendant recently sold the truck to his youngest brother, (3) Defendant needlessly volunteered information, (4) his responses were at times nonsensical and contradictory, and (5) because he had recently stopped a nearly identical truck with a secret compartment for smuggling drugs.

Therefore, the court concludes that Parr lawfully extended the traffic stop when he initiated an investigation into whether Defendant was smuggling drugs to Wichita.

### C.    Stop One: Drug Interdiction Investigation

Defendant's Fourth Amendment claim stemming from the first stop is that Parr unlawfully initiated a drug interdiction investigation.  (Doc. 19 at 10.)  He does not claim in the alternative that even if Parr lawfully extended the stop, Parr's conduct during this first investigation or its length rendered the drug interdiction investigation unlawful.

As discussed in the facts from Section I, Parr began the investigation by pointedly asking Defendant if anyone was paying him and his brother to smuggle drugs or liquor from New Mexico to Wichita.  Defendant responded that he was not being paid to smuggle drugs, and again, informed Parr that Oklahoma law enforcement had already extensively searched the truck.  Parr also asked if the truck had been to the United States' border with Mexico.  Defendant responded affirmatively, informing Parr that he had taken the truck to El Paso, Texas, and Juárez, Mexico.  Parr also asked if he could look at the bolts underneath the vehicle's seat.  Defendant consented to this brief search. Parr did not find anything.

At the suppression hearing, Parr testified that after the search, he believed he had two choices: (1) attempt to establish probable cause in order to further detain Defendant and Jose and conduct a more thorough search, or (2) release them and conduct additional independent research

into the whereabouts of the truck by reviewing its LPR data.  He knew he ran the risk of violating Defendant's Fourth Amendment rights by detaining him any longer, and as a result, derailing a criminal investigation.  Feeling his time running short, Parr chose the second option and released Defendant and Jose.

### D.     Intermission Between Stops One and Two

Parr left before Defendant.  According to his testimony, he traveled northeast (i.e., the same direction Defendant was headed) and attempted to catch a semi-truck that had blown a tire while it had driven past him during the initial stop. As he was driving to catch the semi-truck, Parr testified that he ran the pickup truck's current license plate number through a LPR database.  He discovered that from June 22, 2024 through July 3, 2024, the truck had crossed the US-Mexico border 12 times.  Parr also ran the license plate number that was registered to Defendant when he owned the truck.  He discovered that it had crossed the US-Mexico border 79 times between January 24, 2024 and June 21, 2024.  In total, the pickup truck crossed the US-Mexico border 91 times in a span of less than five and half months before Parr stopped it on July 4, 2024.  He also investigated where the truck traveled in the United States after reentering the country.  He testified that the license plate reader data indicated Defendant was making lengthy drives from the border to Dallas during the same period he claimed to have been working in New Mexico.

Parr also uncovered that Texas law enforcement stopped Defendant and his brother the previous day.  According to Parr's testimony, this was significant.  Parr explained to the court that when Defendant informed him that Oklahoma law enforcement stopped and searched the truck, he assumed an Oklahoma highway patrolman he knows personally and highly respects conducted the search.  Parr testified that he contacted Oklahoma Highway Patrol and discovered that the patrolman was not working the day before.  Once he discovered that someone else had conducted

the search, Parr believed that the truck had not been thoroughly searched by an officer with sufficient expertise and experience to uncover more sophisticated drug compartments.

Parr testified that he never stopped suspecting that Defendant was engaged in criminal activity. He admitted that when he failed to discover anything during the first stop's brief search, he wondered if Defendant was working for the drug cartels in a different capacity other than as a drug smuggler. But when he discovered that Defendant's truck had crossed the US-Mexico border 91 times, that the truck had traveled in Texas during the period when Defendant claimed to have been working in New Mexico, and that his Oklahoma colleague had not thoroughly searched the truck, he was no longer suspicious that Defendant was smuggling drugs, he was convinced of it.

He testified that at this point during his investigation, he decided to stop Defendant a second time if he could find him again.

### E.   Traffic Stop Two

Because Trooper Parr believed he was still ahead of Defendant, he turned around and started driving in the opposite direction that Defendant was headed. Based on the video evidence, he quickly passed Defendant. (Ex. 6 at 2:00–24.) Parr then turned his own vehicle around and pulled Defendant over for a second time.

Defendant asserts that Parr unlawfully extended the second stop by conducting a criminal investigatory stop.[7] (Doc. 19 at 9.) Defendant argues that the extended stop was unlawful because it was based on a hunch. (*Id.* at 11.) By contrast, the government asserts that Parr lawfully stopped

---

[7] Defendant mischaracterizes the second stop as a traffic stop. It was not; rather, it was an investigatory stop. Parr pulled Defendant over a second time because he believed Defendant was smuggling drugs from New Mexico to Wichita. Thus, the proper Fourth Amendment objection would be that Parr did not have reasonable suspicion or probable cause to stop Defendant a second time; not, as Defendant argues, that the second stop was unreasonably prolonged because Parr immediately launched into investigatory questions related to smuggling drugs. (Doc. 19 at 9.) Nonetheless, because Parr had probable cause to stop Defendant a second time, Defendant's mischaracterization of the second stop is harmless.

Defendant a second time because he had both reasonable suspicion and probable cause to believe that Defendant and Jose were trafficking drugs into Kansas. (Doc. 22 at 22–23.)

The court concludes that Parr had probable cause to believe Defendant was trafficking narcotics in the pickup truck when he stopped Defendant a second time. "Probable cause doesn't require proof that something is more likely true than false. It requires only a 'fair probability,' a standard understood to mean something more than a 'bare suspicion' but less than a preponderance of the evidence at hand." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (citation omitted). Here, the basis for Parr's probable cause was not a hunch or bare suspicion. Instead, he relied on what he discovered during the first stop (i.e., the five factors in Section III.B.2)[8] and coupled those findings with his post-stop investigation into (a) Defendant's border crossings and (b) that the truck was not searched by his Oklahoma colleague. Consider, for example, Parr's discovery and analysis about where the truck had traveled in the United States and Defendant's statements about working in New Mexico. According to Parr's testimony, he concluded that Defendant had lied to him about working in New Mexico because the LPR data indicated that the truck was in Dallas while Defendant was allegedly working in New Mexico. Although someone other than the Defendant could have been driving his truck from the border to Dallas as Defendant worked in New Mexico, Parr concluded that that was an improbable scenario. In sum, once Parr had time to do further research into Defendant's whereabouts, the truck's border crossings, and

---

[8] Defendant argues that when Parr failed to discover a secret compartment in the truck during the first stop's brief search, his previous experience with a near identical truck that had a drug compartment in the cab no longer supported the second stop. (Doc. 23 at 9.) Defendant's argument misses the mark. It is not the type of compartment in the truck that supports Parr's probable cause determination. It is the type of truck, and the recognition that otherwise inconspicuous pickup trucks are being outfitted with hidden compartments to smuggle drugs. Parr admitted at the suppression hearing that he believed there was a compartment in the cab. However, he believed there was a compartment in the cab because Defendant was driving a *pickup truck*. Said differently, the inconspicuous nature of the type of vehicle supports Parr's probable cause determination, not the type of compartments within pickup trucks. Moreover, the vehicle is just one factor amongst many that support Parr's probable cause to conduct a second stop and thorough search of Defendant's vehicle.

the realization that his Oklahoma colleague did not conduct the search, his reasonable suspicion that Defendant was engaged in drug smuggling transitioned into a fair probability that Defendant was smuggling drugs.

Thus, the court concludes that Parr's second stop of Defendant was justified under both the lesser standard of reasonable suspicion and the heightened standard of probable cause.

### F.    Second Search

The Fourth Amendment secures the right of an individual against the unreasonable search of their vehicle. *See United States v. Jones*, 565 U.S. 400, 404 (2012). Typically, searches are rendered reasonable because they are supported by a warrant. *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021). However, there are exceptions to the warrant requirement. *United States v. Ventresca*, 380 U.S. 102, 106 (1965). One is the automobile exception, which "permits law enforcement officers who have 'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.'" *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (citation omitted). Under the automobile exception, "[o]nce the officer's suspicions rise to the level of probable cause, they are empowered to search 'the entire vehicle, including the trunk and all containers therein that might contain contraband.'" *Id.* (citation omitted).

As already discussed, a probable cause determination requires a fair probability that a defendant is engaged in criminal activity. *See* Section II.E (quoting *United States v. Denson*, 775 F.3d at 1217); *see United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019).

Defendant argues that Parr did not have probable cause to search the truck for drugs during the second stop.[9] His analysis focuses on three categories of information that could be used to

---

[9] Alternatively, Defendant argues that he did not consent to the search. (Doc. 23 at 11.) Because the court concludes that the search was supported by probable cause, it need not address Defendant's consent arguments.

support Parr's probable cause determination: (1) his observations of Defendant and Jose during the first stop, (2) his investigation into the truck's border crossings in between the first and second stop, and (3) Defendant's admissions that the truck contained unlawful drugs during the second stop.  Defendant argues that the third justification cannot be considered because Parr obtained it in violation of the Fifth Amendment.  According to Defendant, without Defendant's admission, Parr's search was unsupported by probable cause. The government does not object to Defendant's argument that Defendant's statements during the second stop cannot support the probable cause determination.  Regardless, the government asserts that there was probable cause to search the truck because of Parr's research between stops one and two and his conversation and encounter with Defendant during the initial stop.

The court has already concluded that Parr's second stop was justified because he developed probable cause to believe that Defendant was smuggling drugs.  The government argues that for the same reasons, there was probable cause to conduct the second search.  Defendant fails to put forth any arguments to the contrary.  Hence, for the same reasons Parr developed probable cause to stop Defendant a second time, he also developed probable cause to conduct a thorough search of the truck during the second stop.[10]  Therefore, the second search was lawful under the automobile exception.

III.    **Conclusion**

THEREFORE, Defendant's motion to suppress the evidence obtained from stop one, stop two, and the search during stop two is DENIED.

[10] The court need not address Defendant's Fifth Amendment arguments.  Before stopping Defendant a second time, Parr possessed probable cause to search Defendant's truck.  Hence, Defendant's admission about smuggling drugs is not a fatal fact that alters the analysis.

The court notes that there are only seven days remaining for trial under the Speedy Trial Act.  This would not allow the parties much time to prepare for trial, nor would it allow sufficient time to summon a jury.  The court finds it is in the interests of justice to continue the trial on its own motion to allow the parties additional time to prepare and so that a jury may be scheduled in due course.  *See* 18 U.S.C. § 3161(h)(7)(A).  The ends of justice are served by granting this continuance and excluding, for Speedy Trial purposes, the time from the entry of this order to the new trial date.  The case is set for status conference Thursday, May 29, 2025, at 10:00 A.M. in chambers, and the trial is set to begin on June 9, 2025.

IT IS SO ORDERED.  Dated this 28th day of May 2025.

/s/ Judge John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE